## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| KEVIN CORCY,<br><br>                      Plaintiff,<br><br>vs.<br><br>TRANS UNION, LLC,<br><br>                      Defendant. | Case No.: |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Kevin Corcy ("Plaintiff") a living, breathing 35-year-old consumer, brings this action on an individual basis, against Trans Union, LLC, ("Defendant" or "Trans Union") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's credit file with another consumer and inaccurately reporting Plaintiff as deceased.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial

damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Trans Union acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

(a)      The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public

2

confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.       Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.       The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec.

36570 (1970)] (emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16. "Mixed files" create a false description and representation of a consumer's credit history.

17. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18. Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19. More recently, Defendant has been the subject of numerous state attorney general actions relating to its mixed file problem.

20. For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

21.     Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.     Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully

violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco*

*Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Trans Union, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant reported to Plaintiff's potential creditor(s) that Plaintiff is "deceased" and does not have a credit score because Defendant mixed Plaintiff's credit file with that of a deceased consumer.

34.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

35.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

36.     Kevin Corcy ("Plaintiff") is a natural person residing in Rockville, Maryland, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

37.     Trans Union, LLC ("Defendant" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Maryland, including within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

38.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

**A.     Summary of the Fair Credit Reporting Act**

41.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

42.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports").

9

Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

43.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

44.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

45.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.     Defendant's Processing of Credit Information**

46.     Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

47.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

48.     Defendant collects information from thousands of furnishers.

49.     The process by which Defendant receives, sorts, and stores information is largely electronic.

50.     Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

51.     Defendant takes credit information reported by furnishers and creates consumer credit files.

52.     Defendant maintains credit files on more than 200 million consumers.

53.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**C.     Defendant's Mixed File Problem**

54.     Defendant knows that different consumers have similar names.

55.     Defendant knows that different consumers can have similar Social Security numbers.

56.     Defendant knowns that different consumers with similar names can also have similar Social Security numbers.

57.     Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

58.     Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

59.     Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

60.     From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

61.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

62.     Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

63.     A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

64.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

65.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

66.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

67.     Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

68.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

**D.      Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

69.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

70.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

71.     Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

72.     Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

73.     Defendant does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

74.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

75.     Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

76.     In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

77.     The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index (SSDI). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

78.     Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefit paying agencies.

79.     Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

80.     The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

81.     The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[2] [3]

82.     The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[4]

83.     Defendant does not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

84.     Despite being a subscriber of the NTIS LADMF, Defendant does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the

---

[2] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).*
[3] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.
[4] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a credit report about said consumer, or at any time.

85.     Defendant will only cross-reference the NTIS LADMF to sell additional products for an additional fee to its subscribers regarding information contained within the LADMF.

86.     Defendant fails to employ reasonable procedures that assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

87.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

88.     Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

89.     Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

90.     Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

91.     Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

92.     Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

93.     Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

94.     Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

95.     Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

96.     Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

97.     Nevertheless, Defendant does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

98.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

99.     Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

100.    Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

101.    For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

102.    Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it — meaning that no one is continuing to purchase reports about that consumer.

103.    Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

104.    Defendant profits from the sale of reports on deceased consumers.

105.    Defendant has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

106.    Defendant knows that truly deceased consumers do not apply for credit.

107.    Defendant knowns that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

108.    Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

109.    Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

110.    Defendant has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

111.    Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

112.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

113.    Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**E.    Defendant's Years Long Deceased Reporting Regarding Plaintiff**

114.    Plaintiff is a dedicated husband and father who resides in Rockville, Maryland.

115.    In or around the summer of 2019, Plaintiff noticed that he had difficulty being approved for credit opportunities.

116.    At this time, Plaintiff was working with a financial advisor to sort out the inability to utilize his credit; the financial advisor explained to Plaintiff that he was unable to obtain Plaintiff's Trans Union credit report.

117.    Upon information and belief, in or around July 2019, Plaintiff noticed that Trans Union was reporting him as deceased, which caused Trans Union to not provide any credit score about Plaintiff.

118.   Upon information and belief, Plaintiff disputed Trans Union's inaccurate deceased reporting with Trans Union multiple times, in or around July 2019 and July 2020. However, despite Plaintiff's repeated disputes, Trans Union failed to correct the inaccurate deceased reporting on Plaintiff's credit file.

119.   In or around October 18, 2020, Plaintiff and his wife wanted to purchase a new home to better comport with what they initially wanted, which was a larger and more spacious home than the one they possessed.

120.   However, because Plaintiff's credit issue persisted, they were only able to obtain credit based on Plaintiff's wife's credit history. Due to the limitation on the amount the bank was able to offer Plaintiff's wife, Plaintiff and his wife were outbid on the home that they desired.

121.   In May 2021, Plaintiff and his wife attempted once more to submit a mortgage application. However, due to the persistent inaccurate reporting that Plaintiff was deceased, he was again unable to obtain credit approval.

122.   Consequently, Plaintiff's wife had no choice but to apply solely using her own credit information. This resulted in her receiving a limited mortgage offer, which proved insufficient when they were outbid on their desired property yet again.

123.   After this incident, Plaintiff and his wife were devastated and decided to give up on their house search altogether, as they understood and felt that Plaintiff's credit issue – at the hands of Trans Union – was insurmountable.

124.   Indeed, in or around August 2023, Plaintiff and his wife needed to finance the purchase of a car. However, due to the persistent inaccurate reporting by Defendant that Plaintiff was deceased, Plaintiff could not co-sign the financing of the car with his wife. As a result, Plaintiff's wife applied for, and financed the car loan, alone.

125.    Upon information and belief, had Plaintiff co-signed the financing of their car purchase, the interest rate on their car loan would have been reduced as compared to the interest rate that Plaintiff's wife ultimately obtained on the financing of their car loan.

126.    Needless to say, throughout this time-period, during which Defendant was reporting Plaintiff as deceased and/or failing to provide a credit score about Plaintiff, Plaintiff was distressed and distraught over his inability to wield his credit and the deprivation of his opportunities to do so.

127.    At the time and still today, Plaintiff's credit score with non-Defendant credit bureaus remains robust, sometimes nearing a score of 800, even as Trans Union refused and abstained from generating a credit score concerning Plaintiff.

128.    In or around February 2024, Plaintiff remains concerned about his inability to obtain credit due to the limitations Trans Union's inaccurate reporting imposed upon him, such as complete reliance on his wife's credit worthiness and general incapacity to contribute to the advancement of his family's opportunities.

129.    Specifically, Plaintiff's family needed more space than their current home can offer, and Plaintiff knew that without an ability to secure credit and jointly co-sign a mortgage with his wife, an affordable and more suitable home simply cannot be purchased.

130.    Accordingly, Plaintiff redoubled his efforts to finally resolve Trans Union's falsehood.

131.    In March 2024, Plaintiff contacted the Social Security Administration to verify whether he was being reported as deceased. A Social Security Administration representative verified to Plaintiff that he was not being reported as deceased in their system.

**F.      Plaintiff's Mixed Credit File as of April 2024**

132.    Still deeply concerned and worried about Trans Union's reporting, on or about April 10, 2024, Plaintiff obtained a copy of his Trans Union credit report and was aghast and dumbfounded upon discovering therein several pieces of information that did not belong to Plaintiff at all.

133.     Specifically, contained in Plaintiff's Trans Union credit report was a so-called special message that read, "FILE SSN USED IN DEATH BENEFITS CLAIM FOR RUTH BRYANT. DOB: 01/17/1895. DOC: 03/01/1973. ZIP CODE LAST RESIDENCE IS 07104, MOST LIKELY NEWARK, NJ."

134.    Plaintiff does not know anyone by the name of Ruth Bryant.

135.    Upon information and belief, this message has been on Plaintiff's credit file for years, and since at least July of 2019.

136.    Between July of 2019 and still today, Plaintiff maintains multiple active credit tradelines, on which accounts he has made payments.

137.    Thus, Trans Union knew and/or should have known that Plaintiff was not deceased, especially because dead consumers do not usually utilize credit, accrue balances, which they then pay-off. In addition, Trans Union's credit file and credit reports concerning Plaintiff were internally inconsistent and contradictory for the same reason.

138.    Defendant's reporting that Plaintiff was deceased, and particularly that he had been deceased since 1895, was blatantly inaccurate, as Plaintiff is alive.

139.    Plaintiff further discovered the unrecognized and inaccurate address of 2204 Bahia Vista ST Apt D8, Sarasota, FL 34239-2406.

140.    Plaintiff has never lived in Florida and has no personal relationship with anyone who does reside there.

141.    By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**G.      Plaintiff Applies for a PayPal Credit Card**

142.    In or around April of 2024, Plaintiff was interested in securing another credit card.

143.    On or about April 28, 2024, Plaintiff completed and submitted a credit card application for a Synchrony Bank credit card.

144.    For Synchrony Bank ("Synchrony") to make a determination on Plaintiff's credit application, it needed to obtain copies of his credit files. Plaintiff provided Synchrony with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

145.    On or about April 28, 2024, Defendant sold a credit report about Plaintiff to Synchrony in response to Plaintiff's credit application for the Synchrony Bank credit card.

**H.      Synchrony Denies Plaintiff's Credit Card Application**

146.    On or about April 28, 2024, Synchrony issued an adverse action notice to Plaintiff. Within that letter, Synchrony communicated that it had denied Plaintiff's credit application because it was unable to verify his identity based on the contents of Plaintiff's Trans Union credit report.

147. Upon information and belief, Synchrony was unable to verify Plaintiff's identity through his Trans Union credit report because Trans Union continued to mix Plaintiff's credit file with that of a distinctive, unrelated, consumer named Ruth Bryant, who has been deceased since 1895.

148. Upon information and belief, as a result of this mix, Defendant reported Plaintiff to be deceased.

149. Defendant's reporting was grossly inaccurate as Plaintiff is not now, and has never been, deceased.

150. The credit file provided to Synchrony by Defendant was patently false on its face – Defendant reported Plaintiff's identity to be unverifiable and likely also failed to return a credit score for Plaintiff because Defendant had a deceased notation on Plaintiff's credit file.

151. Defendant's deceased notation, and its report to Synchrony of the unverifiability of Plaintiff's identity due thereto, was patently incorrect because Plaintiff is alive.

152. It was inaccurate for Defendant to publish information to a third party indicating that Plaintiff was deceased when Plaintiff was in fact alive.

153. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

154. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; inability to adequately provide for his family; damage by loss of credit and loss of opportunity arising from loss of credit which in turn, caused substantial strain on Plaintiff's financial situation and personal life.

155.    As a result of Defendant's inaccurate and violative reporting, Plaintiff experienced significant emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

156.    Plaintiff's inability to secure credit and financing negatively impacted Plaintiff's ability to provide for his family financially and emotionally, resulting in marital discord, stress, and tensions within his household. Plaintiff and his wife endured considerable struggles, arguments, and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

### CLAIMS FOR RELIEF

#### COUNT I
#### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendant Trans Union)**

157.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

158.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

159.    On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

160.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

161.    Defendant mixed another, likely deceased consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

162.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

163.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; inability to adequately provide for his family; damage by loss of credit and loss of opportunity arising from loss of credit which in turn, caused substantial strain on Plaintiff's financial situation and personal life. The inability to secure credit and financing negatively impacted Plaintiff's ability to provide for his family financially, resulting in marital discord, stress, and tensions within his household. Plaintiff and his wife endured considerable struggles, arguments, and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

164.    Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

165.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

a)    Determining that Defendant negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: May 17, 2024,                    */s/ Levi Y. Eidelman*
Levi Y. Eidelman, MD Bar No. 30903
**CONSUMER ATTORNEYS**
300 Cadman Plaza West, 12th Floor, Suite 12049
Brooklyn, NY 11201
T: (718) 360-0763
E: leidelman@consumerattorneys.com

*Attorneys for Plaintiff Kevin Corcy*